The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.<br><br>        Defendants,<br><br>and<br><br>KING COUNTY and the CITY OF TACOMA,<br><br>        Intervenor-Defendants. | Case No. 2:21-cv-1637-BJR<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

This matter is before the Court on cross motions for summary judgment by Plaintiff Northwest Environmental Advocates ("Plaintiff"); Defendants Environmental Protection Agency

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 1

("EPA"), Michael Regan, and Casey Sixkiller (collectively, "Defendants"),[1] and Intervenor-Defendants City of Tacoma and King County (collectively, "Intervenor-Defendants").

Plaintiff brings a single claim under the citizen-suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(2), alleging that Defendants failed to perform a nondiscretionary duty under the CWA pertaining to pollution in Washington State's Puget Sound. Having reviewed the materials and the relevant legal authorities, the Court denies Plaintiff's Motion for Summary Judgment and grants the Motions for Summary Judgment filed by Defendants and Intervenor-Defendants. The reasoning for the Court's decision follows.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff Northwest Environmental Advocates is a non-profit environmental organization concerned with water and air quality in the Northwest. Amend. Compl. ¶ 14, Dkt. No. 24. Plaintiff initiated this action in December 2021. In September 2022, the Court administratively closed the case while the parties pursued settlement negotiations. In July 2024, following failed settlement negotiations, the Court granted a joint motion by the parties to reopen the case. In November 2024, the Court granted a joint motion by the City of Tacoma and King County to intervene in this action.

Plaintiff now moves for summary judgment on its CWA citizen-suit claim. Defendants have jointly filed a cross-motion for summary judgment. Intervenor-Defendants have also jointly filed a cross-motion for summary judgment. Additionally, each of the parties raise evidentiary objections.

### B.  The CWA Statutory Framework

---

[1] Michael Regan is sued in his official capacity as Administrator of the EPA. Casey Sixkiller is sued in his individual capacity as EPA Region 10 Administrator.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 2

Congress passed the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. In order to achieve that objective, Congress declared as a "national goal" that the "discharge of pollutants into the navigable waters be eliminated by 1985." *Id.* § 101(a)(1).

The CWA's regulatory program focuses on two potential sources of pollution: "point" sources and "nonpoint" sources. A "point" source is any "discernible, confined and discrete conveyance" from which pollutants may be discharged. *See id.* § 1362(14). A "nonpoint" source is any non-discrete source, such as runoff from stormwater or irrigation of agriculture. *Id.* The CWA regulates point source pollution through the National Pollution Discharge Elimination System ("NPDES") permit process. NPDES permits limit the discharge of pollutants through quantitative limits on the amount of pollutants released from each point source. *See id.* § 1342. The EPA has the authority to issue NPDES permits itself, *id.* § 1342(a), or delegate that responsibility to the States, *id.* § 1342(b). It has done so in almost every State, including Washington. 39 Fed. Reg. 26,061 (1974).

As part of its regulatory program, § 303(d) of the CWA imposes duties on the states and the EPA. States are required, subject to federal oversight, to adopt water quality standards for each waterbody or waterbody segment within the state's boundaries. 33 U.S.C. § 1313. If a waterbody does not meet these standards or is not expected to meet them, the state must then designate that body as a "water quality limited segment." 40 C.F.R. § 130.2. The list of water quality limited segments is known as the "303(d) list." States are further required to establish a "priority ranking" of the water quality limited segments based on "the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). Consistent with these priorities, States must establish "total maximum daily loads" ("TMDL") for each pollutant impairing a water quality limited

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 3

segment. 40 C.F.R. § 130.2(f). A TMDL establishes the maximum amount of pollutants a water quality limited segment can receive daily without violating the state's water quality standards. *Id.*

States must submit the ranked list of water quality limited segments and TMDLs to the EPA "from time to time." 33 U.S.C. § 1313(d)(2). Once a submission is made, certain mandatory EPA duties are triggered. First, within 30 days of submission, the EPA must approve or disapprove of the water quality limited segments and corresponding TMDLs. *Id.* If the EPA approves a submission, that submission is incorporated by the state into its continuing planning process and NPDES permitting. *Id.* § 303(e)(3). If the EPA disapproves, the EPA must, within 30 days of the disapproval, make its own identification of appropriate water quality limited segments or establish its own TMDLs. *Id.*

### C.  Pollution and Dissolved Oxygen Levels in Puget Sound[2]

This case concerns the effects of pollution on dissolved oxygen levels in Puget Sound. Puget Sound is an inlet of the Pacific Ocean comprised of a vast network of interconnected marine waterways, river deltas, and basins that open to the Strait of Juan de Fuca and the Strait of Georgia. *See* Administrative Record ("AR")_0011044 n.1, AR_0016538-39, AR_0016544. These waters are collectively referred to as the "Salish Sea." Amend. Compl. ¶ 58.

It is undisputed by the parties that environmental pollution is endangering the health of marine species in Puget Sound. One of the pollutants impairing Puget Sound is nitrogen. AR_0007095, AR_0016537. Puget Sound receives nitrogen from both natural and anthropogenic sources. AR_0007095, AR_0032430. Among the anthropogenic sources, wastewater treatment facilities are Puget Sound's largest source of nitrogen loading. AR_0007096, AR_0017555; *see*

---

[2] The factual allegations referenced in this subsection are undisputed.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 4

*also* AR_0013866 (showing sewage treatment plants contribute to nitrogen loading 60 percent annually and 80 percent in summer).

Excess nitrogen fuels growth of marine plants like algae. AR_0016537. As these plants die and decompose, they consume large amounts of dissolved oxygen, thereby lowering overall dissolved oxygen levels. *Id.* Low levels of dissolved oxygen, in turn, lead to the migration, weakening, and death of fish and other organisms. *Id.*, AR_0007094, AR_0016626. Washington's water quality standards include minimum levels of dissolved oxygen. Amend. Compl. ¶ 108. As of 2019, the Washington Department of Ecology ("Ecology," or the "State") estimates that approximately 20 percent of Puget Sound violates water quality standards for dissolved oxygen. AR_0011044.

**D. Efforts to Reduce Nitrogen Pollution and Improve Dissolved Oxygen Levels**

Defendants assert that Ecology has made ongoing efforts to reduce anthropogenic nitrogen loading caused by wastewater treatment facilities in Puget Sound, including (1) research using the "Salish Sea Model," (2) development of the Draft Puget Sound Nutrient Reduction Plan ("Nutrient Reduction Plan" or "Plan"), and (3) development of TMDLs for Budd Inlet.

**1. The Salish Sea Model**

According to Defendants and Intervenor-Defendants, Ecology and the Pacific Northwest National Laboratory began developing the Salish Sea Model in 2008 in an effort to better understand and isolate the causes of low dissolved oxygen levels in Puget Sound. EPA Resp. & Cross-MSJ at 11, Dkt. No. 65; Intervenors' Resp. & Cross-MSJ at 8-9, Dkt. No. 66. The Salish Sea Model is a computer tool that simulates hydrodynamic processes to assess how nutrients, including

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 5

nitrogen, affect water quality in the Salish Sea. AR_0001338.[3] Defendants and Intervenor-Defendants assert that using the Salish Sea Model to isolate the causes of low dissolved oxygen levels for Puget Sound is a critical step in addressing those levels, given that they arise from both natural and anthropogenic sources. EPA Resp. & Cross-MSJ at 10-12; Intervenors' Resp. & Cross-MSJ at 7-8; *see also* AR_0007095.

### 2. The Nutrient Reduction Plan

In June 2025, Ecology released for public comment the Nutrient Reduction Plan. AR_0032411. The Nutrient Reduction Plan was developed using information gathered from the Salish Sea Model. AR_0007100. Defendants describe the Plan as a "draft advance restoration plan for all of Washington's waters in the Salish Sea, including Puget Sound." EPA Resp. & Cross-MSJ at 13; *see also* AR_0032411. The Nutrient Reduction Plan states,

> In more recent years EPA has acknowledged that the CWA allows other cleanup approaches to restore water quality such as an advance restoration plan (ARP). An ARP contains many of the same elements as a TMDL but provides more flexibility in how cleanup efforts are approached with the goal of cleaning up water faster than a traditional TMDL . . . . This plan details our ARP approach to meet marine dissolved oxygen DO standards which will be implemented prior to development of a TMDL. In the event we cannot meet water quality standards with this approach the requirement to develop a TMDL still remains.

AR_0032423. The Plan purports to set total nitrogen loading targets for Puget Sound's marine point sources and watersheds at a level that attains dissolved oxygen standards across Puget Sound. AR_0032441. The Plan states that these targets are meant to form the basis for effluent limitations in NPDES permits. AR_0032446–47, AR_0032450–51. The Plan also provides a table with

---

[3] *See also* Wash. Dep't of Ecology, *Salish Sea Model*, https://ecology.wa.gov/research-data/data-resources/models-spreadsheets/modeling-the-environment/salish-sea-modeling (last visited Mar. 21, 2026).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 6

"Measurable Milestones" and target dates for completion of each milestone. AR_0032470. Additionally, the Plan states that the milestones are set to enable achievement of the nitrogen targets by 2050. AR_0032433.

### 3. The Budd Inlet TMDLs

Defendants assert that Ecology has started to address the need for Puget Sound dissolved oxygen TMDLs, as evidenced by Ecology's development of 13 dissolved oxygen TMDLs for Budd Inlet. EPA Resp. & Cross-MSJ at 2 n.1, 9, 18, 22-23. Budd Inlet is an 8.3 square mile inlet to South Puget Sound. AR_0000728. Budd Inlet was first added to the 303(d) list of impaired waters for low dissolved oxygen in 1996. *Id.* According to a 2022 EPA Memorandum, the Inlet has been a focus area for water quality improvements for many years because it has naturally low dissolved oxygen levels and receives wastewater treatment discharges from the largest municipal plant in southern Puget Sound. AR_0007099.

Since 1973, Ecology has consistently monitored dissolved oxygen levels at one Budd Inlet location and less frequently at a second location. AR_0001320. Over the past 40 years, Ecology has also completed multiple studies on Budd Inlet. For example, a 1986 study commissioned by Ecology highlighted the problems caused by low dissolved oxygen within the Inlet, inculpating low dissolved oxygen conditions in fish kills and water quality violations extending back to 1971. AR_0001518. In the 1990s, several studies confirmed that the dissolved oxygen concentration for Budd Inlet varies significantly between summer and winter. AR_0001327. In 2006, Ecology conducted the South Puget Sound Dissolved Oxygen Study, which monitored dissolved oxygen levels at multiple Budd Inlet sites. AR_0001340. In 2014, Ecology published a Report (the "2014 Report") based on data obtained using the Salish Sea Model. AR_0016533, AR_0016643. The 2014 Report analyzed how Salish Sea dissolved oxygen concentrations respond to population increases,

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 7

ocean conditions, and climate change. AR_0016533. Additionally, the 2014 Report provided predictions regarding the impact of future human nutrient loads on dissolved oxygen for Puget Sound through the year 2070. AR_0016629.

In October 2022, Ecology submitted the 13 Budd Inlet TMDLs to the EPA. AR_0000726. EPA approved the TMDLs around December 2022. *Id.*

## III.   DISCUSSION

### A. Motions for Summary Judgment

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Acct. No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)); Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion." *Id.* If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). On cross-motions for summary judgment, the court considers each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56.

The parties dispute whether Ecology should be deemed to have constructively submitted no Puget Sound dissolved oxygen TMDLs pursuant to the "constructive submission doctrine." Section

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 8

505(a)(2) of the CWA authorizes citizens to institute actions in federal court against the EPA for failure to perform any act or duty under the CWA that is not discretionary with the EPA. 33 U.S.C. § 1365(a)(2). The CWA is silent as to the nature of the EPA's obligations if a state fails to make any TMDL submissions or fails to make a particular TMDL submission. In addressing this statutory gap, courts have adopted the constructive submission doctrine.[4]

The constructive submission doctrine was first articulated by the Seventh Circuit in *Scott v. City of Hammond*, 741 F.2d 992, 996 (7th Cir. 1984). In *Scott*, the Seventh Circuit held that, if a state fails over a long period of time to submit proposed TMDLs, that prolonged failure may amount to the constructive submission by that state of no TMDLs, which triggers the EPA's mandatory duty to act on that submission in accordance with the CWA. *Id.* In reaching this conclusion, the Seventh Circuit reasoned,

> We cannot allow the states' refusal to act to defeat the intent of Congress that TMDL's be established promptly—in accordance with the timetable provided in the statute. In addition, to construe the relevant statute [any other way] would apparently render it wholly ineffective. There is, of course, a strong presumption against such a construction.

*Id.* at 998. Since *Scott*, multiple other circuits have adopted some version of the constructive submission doctrine. *See, e.g.*, *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001); *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 883 (9th Cir. 2002). In *BayKeeper*, the Ninth Circuit adopted the constructive submission doctrine, noting that "[u]nder this doctrine, a complete

---

[4] The EPA asserts that the constructive submission theory is not a valid basis for a § 505(a) citizen suit because the constructive submission theory has no basis in the text of the CWA. EPA Resp. & Cross-MSJ at 14-15. However, as the EPA acknowledges, the Ninth Circuit has upheld § 505(a) citizen suits alleging claims under the constructive submission doctrine. *See Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1205 (9th Cir. 2019). Accordingly, the Court rejects EPA's argument.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 9

failure by a state to submit TMDLs will be construed as a constructive submission of no TMDLs, which in turn triggers the EPA's nondiscretionary duty to act." *BayKeeper*, 297 F.3d at 881. However, in adopting the constructive submission doctrine, the Ninth Circuit also adopted the limitation imposed by other circuits that "'[i]t applies only when the state's actions *clearly and unambiguously* express a decision' not to submit TMDLs." *Id.* at 882 (emphasis added) (quoting *Hayes*, 264 F.3d at 1024).

Plaintiff asserts that (1) Ecology has never developed a TMDL to address Puget Sound-wide impairment, and (2) Ecology has no schedule or credible plan for completing a Puget Sound dissolved oxygen TMDL, and therefore, a constructive submission has occurred that triggered EPA's duty to develop its own TMDLs. Pl.'s MSJ at 14-17, 20-28, Dkt. No. 60.

In response, Defendants and Intervenor-Defendants contend that Ecology is producing TMDLs at a reasonable pace and has already begun developing TMDLs to address low dissolved oxygen levels in Puget Sound, as evidenced by the submission of the Budd Inlet TMDLs. EPA Resp. & Cross-MSJ at 17-18; Intervenors' Resp. & Cross-MSJ at 23. Defendants and Intervenor-Defendants contend that Ecology's Nutrient Reduction Plan is a reasonable interim plan for addressing dissolved oxygen impairment in Puget Sound while Ecology exercises its discretion to prioritize the development of other TMDLs. EPA Resp. & Cross-MSJ at 17, 20-23; Intervenors' Resp. & Cross-MSJ at 14-17, 21. Defendants and Intervenor-Defendants also assert that Ecology's stated commitment to developing further dissolved oxygen TMDLs for Puget Sound as needed following implementation of the Nutrient Reduction Plan demonstrates that Ecology has not abandoned its commitment to developing Puget Sound dissolved oxygen TMDLs. EPA Resp. & Cross-MSJ at 18-19, 22; Intervenors' Resp. & Cross-MSJ at 23.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 10

As an initial matter, the parties make seemingly contradictory assertions regarding whether Ecology has developed a Puget Sound TMDL. These contradictions result, in part, from the fact that Plaintiff challenges EPA's failure to develop a dissolved oxygen TMDL for Puget Sound as *a single watershed*. *See, e.g.*, Pl.'s MSJ at 14 ("Ecology has failed to develop and submit a Puget Sound TMDL for nearly 30 years."). Defendants do not dispute that Ecology has never developed a single Puget Sound-wide TMDL for dissolved oxygen. However, Defendants correctly point out that neither the CWA nor EPA regulations require a Sound-wide approach to TMDL development. EPA Resp. & Cross-MSJ at 2 n.1. Defendants and Intervenor-Defendants also emphasize that developing a single Sound-wide TMDL would present unique challenges given the complex geography of the Sound, the numerous point and non-point sources that contribute to its pollution, and a lack of readily available technology to address pollution at some point sources. *See id.* at 11 ("Unlike a typical river or stream where water flows one-way down a well-defined channel, Puget Sound is an extremely complex waterbody carved up into inlets, coves, passageways, and underwater ridges."); Intervenors' Resp. & Cross-MSJ at 7 ("[T]he Sound receives nitrogen from diverse sources, including oceanic inflows, riverine inputs, atmospheric deposition, and wastewater discharges."); Intervenors' Reply at 11, Dkt. No. 80 ("Advanced technology is not readily available for all point source contributors of nutrients, despite [Plaintiff]'s argument to the contrary). Because Ecology has discretion to establish dissolved oxygen TMDLs for individual waterbodies within Puget Sound, the Court considers actions taken by Ecology with respect to those individual waterbodies in addressing Plaintiff's constructive submission claim.

Furthermore, in determining whether a state has constructively submitted no TMDLs, relevant considerations may include (1) whether the state has failed to develop and submit a TMDL

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 11

for a prolonged period, and (2) whether the state has developed a schedule and credible plan for producing the TMDL. *See Riverkeeper*, 944 F.3d at 1211.

As to the first consideration—failure to develop and submit a TMDL for a long period—Ecology submitted the 13 Budd Inlet TMDLs in 2022. AR_0000726. The Court acknowledges that Ecology's submission of only 13 dissolved oxygen TMDLs after approximately 28 years is modest progress at best. *See id.*; EPA Resp. & Cross-MSJ at 10. However, given the relatively recent development of the Budd Inlet TMDLs, the Court cannot conclude that a constructive submission, of no Puget Sound dissolved oxygen TMDLs has occurred. *See BayKeeper*, 297 F.3d at 883; *Hayes*, 264 F.3d at 1023 ("If a state has submitted or soon plans to submit TMDLs for its impaired waterbodies, the constructive-submission analysis would be factually inapplicable."). Indeed, in *BayKeeper*, the Ninth Circuit found that no constructive submission occurred where California had produced some TMDLs following a 15-year period during which California submitted no TMDLs. *BayKeeper*, 297 F.3d at 883; *see also Idaho Sportsmen's Coal. v. Browner*, 951 F. Supp. 962, 968 (W.D. Wash. 1996) (finding no constructive submission where 3 TMDLs were submitted and approved over a 17-year period). Ecology's submission of some TMDLs in this case is indicative that Ecology has not abandoned development of Puget Sound dissolved oxygen TMDLs.

Regarding whether Ecology has a credible plan for completing the remaining Puget Sound dissolved oxygen TMDLs, it is undisputed that, since submitting the 13 Budd Inlet TMDLs, Ecology has declared its intent to pursue an alternative restoration plan in the form of the Nutrient Reduction Plan. *See* AR_0032421. Plaintiff contends that the Nutrient Reduction Plan is an inadequate alternative that Defendants and Ecology intend to use to indefinitely delay the development of additional Puget Sound dissolved oxygen TMDLs. Pl.'s MSJ at 16-23. However, the record contains ample evidence that Puget Sound is an extraordinarily complex waterbody

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 12

impacted by variable processes that influence dissolved oxygen levels. *See, e.g.*, AR_0004778 (stating Ecology's position that it does not have "all the data and analysis necessary to immediately and effectively develop a TMDL for nutrients in a system as complex and vast as Puget Sound"), AR_0007094 ("The Puget Sound is a large, dynamic and complex system influenced by large-scale climatological, meteorological, watershed, and hydrological drivers that produce large spatial and temporal variation in dissolved oxygen."), AR_0016523-0016673. Given this complexity, Ecology's decision to postpone the development of additional dissolved oxygen TMDLs for Puget Sound while pursuing additional research and exploring alternative methods for improving dissolved oxygen levels is a reasonable course to follow.

Importantly, the Nutrient Reduction Plan proposes nitrogen loading targets for watersheds that drain into Puget Sound while Ecology also conducts necessary research to better understand the degree to which nitrogen pollution in various segments of Puget Sound is the result of wastewater treatment plants. AR_32441-44, AR_0032470. This information, in turn, would enable Ecology to develop scientifically supported effluent limitations for use in NPDES permits. AR_32444. Furthermore, should the Nutrient Reduction Plan fail to obviate the need for Puget Sound dissolved oxygen TMDLs, Ecology states that it intends to use the effluent limitations developed through the Plan to produce the appropriate TMDLs. AR_0032421-23.

It is true that Ecology has already conducted multiple studies concerning dissolved oxygen levels in segments of Puget Sound. *See supra* § II.D.3. Nevertheless, the evidence supports the contention by Defendants and Intervenor-Defendants that further research is necessary to effectively address low dissolved oxygen levels across Puget Sound more broadly. EPA Resp. & Cross-MSJ at 25-27; AR_0007103; Latterell Decl. ¶¶ 7-8, Dkt. No. 69. Accordingly, the Nutrient Reduction Plan represents "a reasonable interim measure rather than an abandonment of any future

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 13

plans to prepare a TMDL." *Sierra Club v. McLerran*, No. 11-CV-1759-BJR, 2015 WL 1188522, at *8 (W.D. Wash. Mar. 16, 2015). Given the ongoing Nutrient Reduction Plan together with the submitted Budd Inlet TMDLs, this Court finds that the State has not clearly and unambiguously decided not to submit Puget Sound dissolved oxygen TMDLs. Plaintiff's Motion for Summary Judgment is denied, and Defendants' and Intervenor-Defendants' Motions for Summary Judgment are granted.

## IV.    ADMISSIBILITY OF EVIDENCE

On summary judgment, if a party "object[s] that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P 56(c)(2), then "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated," *id.*, committee note to 2010 amendments. A district court must rule on evidentiary objections that are material to its ruling. *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

### A.  Plaintiff's Evidence

Defendants and Intervenor-Defendants challenge the admissibility of most of the exhibits to the Declaration of Andrew Hawley, Dkt. Nos. 61-1 through 61-19, and the Declarations of Nina Bell, Dkt. No. 60-2, Ron Peltier, Dkt. No. 60-3, and Helen Bresler, Dkt. No. 60-4.

#### 1.  Exhibits to Andrew Hawley Declaration

Exhibits to the Hawley Declaration are historical in nature, whose sole purpose is to provide background. EPA Resp. & Cross-MSJ at 30. As such, the Court finds that they are not material to the Court's ruling.

#### 2.  Declarations of Ron Peltier and Helen Bresler

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 14

Defendants and Intervenor-Defendants object to the Peltier and Bresler Declarations on several grounds. *Id.*; Intervenors' Reply at 19. Plaintiff responds that the Peltier and Bresler Declarations were submitted to establish Plaintiff's standing to bring this action. Pl.'s Resp. & Reply at 32, Dkt. No. 75.

Since neither Defendants nor Intervenor-Defendants challenge Plaintiff's standing to bring this action, the Peltier and Bresler Declarations lack relevance and the objection is sustained.

### 3. Declaration of Nina Bell

Plaintiff proffers the Bell Declaration for historical context. Pl.'s Resp. & Reply at 32. As such, the Court finds that it is not material to the Court's ruling.

### B. Intervenor-Defendants' Evidence

Plaintiff challenges the admissibility of three declarations filed by Intervenor-Defendants: the Declarations of Kamuron Gurol, Dkt. No. 68, Ramiro Chavez, Dkt. No. 70, and Joshua Latterell. Pl.'s Resp. & Reply at 33-37. Plaintiff contends that each of these Declarations are inadmissible and should be stricken because they are not relevant to the question of whether the State has constructively submitted no Puget Sound dissolved oxygen TMDLs to EPA. *Id.* at 33. Plaintiff also asserts that each of the challenged Declarations contain inadmissible expert testimony and opinion testimony, hearsay, speculation, and conclusory statements that are not based upon the witness' personal knowledge. *Id.* at 34-37. Plaintiff further contends that Defendants have failed to establish the qualifications of each witness. *Id.* at 34-35.

### 1. Declaration of Kamuron Gurol

The Court overrules Plaintiff's objections to paragraphs 1-20 of the Gurol Declaration. Evidence is relevant if "it has any tendency to make a fact more or less probable . . . and th[at] fact is of consequence in determining the action." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 15

(9th Cir. 2019) (quoting Fed. R. Evid. 401). Paragraphs 1-20 of the Gurol Declaration easily meet the relevancy standard. As Intervenor-Defendants point out, the Gurol Declaration discusses the technical challenges and costs of upgrading wastewater treatment plants and concomitant impacts on ratepayers. *See* Intervenors' Reply at 15. These considerations are relevant to how the State prioritizes TMDL development and the timeline for such development.

Regarding the remaining objections to paragraphs 1-20, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible in evidence, and must show the declarant or affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).

The Court concludes that paragraphs 1-20 of the Gurol Declaration meet the personal knowledge requirement. Gurol is the Director of the Wastewater Treatment Division in King County, Washington and states that his Declaration is based on personal knowledge. Gurol Decl. ¶¶ 2-3. This information is sufficient to infer personal knowledge. The Court thus overrules the objections to paragraphs 1-20 based on lack of personal knowledge and foundation. The Court also overrules the other objections to paragraphs 1-20 of the Gurol Declaration. As to the remaining part of the Gurol Declaration, paragraphs 21-28, those paragraphs are largely redundant of other materials in the record and the Court has not relied on them.

### 2. Declaration of Ramiro Chavez

Plaintiff objects to several paragraphs of the Chavez Declaration as hearsay, including paragraphs 9, 20, 21 25-26, 33-36, 39, and 41. The Court has not relied on these paragraphs in reaching its decision. As to the remaining portions of the Chavez Declaration, the Court overrules Plaintiff's objections. Like the Gurol Declaration, the Chavez Declaration provides relevant information regarding the technical challenges and costs of upgrading wastewater treatment plants

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 16

and concomitant impacts on ratepayers. Chavez's personal knowledge can be inferred from his position as Director of the Environmental Services Department and City Engineer for the City of Tacoma, Washington and his sworn statement that his Declaration is based on personal knowledge. Chavez Decl. ¶ 1.

### 3. Declaration of Joshua Latterell

The Court finds that the Latterell Declaration is admissible. The Latterell Declaration discusses considerations relevant to the development of TMDLs. *See* Intervenors' Reply at 14-17. As to Plaintiff's objection to Latterell's expertise under Federal Rule of Evidence 702, Intervenor-Defendants have provided the Court with a copy of Latterell's curriculum vitae ("CV"). Latterell CV, Dkt. No. 82-1. The CV sufficiently establishes Latterell's qualifications. *See id.* Additionally, the Court finds the Latterell Declaration sufficiently identifies the basis and reasons for his expert opinion, the information that he considered in forming the opinions, and that his expert testimony is the product of reliable principles and methods.

## V.   CONCLUSION

For the foregoing reasons:

1.  Plaintiff's Motion for Summary Judgment (Dkt. No. 60) is DENIED.

2.  Defendants' Motion for Summary Judgment (Dkt. No. 65) is GRANTED.

3.  Intervenor-Defendants' Motion for Summary Judgment (Dkt. No. 66) is GRANTED.

DATED this 3rd day of April 2026.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

- 17